Jasen, J.
(dissenting). I dissent and vote to reverse the order of the Appellate Division and to uphold the designation of the Morgan Mansion as a city landmark.
*133 It cannot be said, as a matter of law, that the designation is without a rational basis and, hence, it should be sustained.[1] Moreover, because there were no findings of fact in the courts below with respect to the constitutionality of the Landmarks Preservation Law as applied, the matter should be remitted to the Supreme Court, New York County, for further proceedings. (See Gerbig v. Zumpano, 7 N Y 2d 327; 7 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 5613.04.) In the rather bizzare procedural posture that this case comes to us, the constitutional issue is not ripe for adjudication. While some proof on the constitutional issue was received at Trial Term, no findings of fact were made with respect to plaintiff’s claim of hardship. Nor did the Appellate Division make any findings.[2] Accordingly, the matter should be remitted for further proceedings to determine whether the designation of the Morgan Mansion as a landmark seriously interferes with plaintiff’s charitable purposes and, hence, imposes an undue and unconstitutional burden. (See Matter of Trustees of Sailors’ Snug Harbor v. Platt, 29 A D 2d 376.)
The historic preservation movement in the United States began in 1850 when the State of New York acquired the Hasbrouck House, G-eneral Washington’s Revolutionary War headquarters at Newburgh. Since then, however, many cherished buildings, essential parts of the Nation’s architectural and cultural heritage, have fallen before the wrecker’s ball. Indeed, more than 50% of the 12,000 buildings listed in the Historic *134 American Building Survey, commenced in 1933 by the Federal Government, have since been razed.[3] (See Conti, Preserving the Past, Wall St. J., Aug. 8, 1970, p. 1, col. 1.) As is well illustrated here, the situation is most critical in urban areas where the forces that produce physical change are most dynamic. Urban landmarks typically do not exhaust the building potential of their location and may be designed for uses different from neighboring buildings. As urban concentration increases, the demands for additional housing and commercial space become all the more incessant and sharpen the debate whether the value of historic preservation counterbalances whatever limitation may thereby be imposed on urban growth. For many reasons, widespread public ownership of historic property is simply not feasible. Historic property may be expensive to acquire and maintain and in public ownership would quite likely be removed from economically productive uses, thereby reducing the community tax base. Economic considerations alone suggest the desirability of providing standards, controls and incentives to ■ encourage private owners to preserve their historic properties for use in economically productive enterprises.
The City of New York has responded to this challenge with a thoughtful and comprehensive statutory scheme. Enacted in 1965 pursuant to State enabling legislation (New York State Historic Preservation Act of 1956 [former General City Law, § 20(25-a), L. 1956, ch. 216]), the Landmarks Preservation Law seeks to preserve improvements and districts of especial historical, cultural or'architectural significance in the life of the city.[4] The draftsmen of the law, obviously cognizant of the *135 constitutional limitations upon the use of the police power in zoning for historic-preservation, incorporated provisions affording relief from regulations affecting reconstruction, alteration or demolition of landmarks which are not earning a reasonable return. (See Administrative Code of City of New York, § 207-1.0, subd. q; § 207-8.0, subd. c.) Separate standards apply to charitable owners (§ 207-8.0, subd. i, par. [1]) of landmark property. However, there is no express provision governing the instant situation where the charitable owner does not wish to sell or lease his property, but claims it is unsuited for his purposes and cannot obtain commission approval for his proposal to alter or demolish the structure. (See Matter of Trustees of Sailors' Snug Harbor v. Platt, 29 A D 2d 376, supra.) Before undertaking adjudication of the constitutional-, ity of the Landmarks Preservation Law as applied to this type of situation, we should have the benefit, of a full exposition of all factual issues with express findings made in the courts below. The instant record simply does not afford us that perspective and as such cannot suffice to render a constitutional determination of such far reaching import to the future of landmarks preservation in the City of New York, the State and the Nation as well.
Judges Jones, Wachtleb, Babin and Stevens concur with Judge Gabbielli; Judge Jasen dissents in part and votes to reverse in a separate opinion in which Chief Judge Bbeitel concurs.
Order modified, with costs to plaintiff-respondent, in accordance with opinion herein and, as so modified, affirmed.

. As to the scope of appellate review of a determination made by an administrative agency acting in its quasi-legislative capacity (see 1 N. Y. Jur., Administrative Law, §§ 178, 185; see, also, Staten Is. Edison Corp. v. Maltbie, 270 App. Div. 55, 65-66 [Foster, J., dissenting]).

. Also, I note that plaintiff's property is apparently not zoned for the proposed 19-story office building, a restriction which if not varied effectively renders this controversy academic. Moreover, as bearing on the hardship issue, there has been no exposition whatever of plaintiff’s option to transfer the air rights, the theoretical surplus of unused floor area, from the landmark site to plaintiff’s adjacent five-story administrative office annex. (See New York City Zoning Resolution, art. VII, ch. 4, §§ 74-79, 74-791 to 74-793; see, also, Marcus Air Rights Transfers in New York City, 36 Law and Contemporary Problems 372.) But most importantly, the courts below have made no findings whatsoever respecting plaintiff’s claim of undue hardship imposed by the landmark designation.

. By way of comparison, the countries of Western Europe have moved far more vigorously to preserve their respective heritages. (See, e.g., Legal Methods of Historic Preservation, 19 Buffalo L. Rev. 611, 624^628; Ashworth, Contemporary Developments in British Preservation Law and Practice, 36 Law and Contemporary Problems 348.)

. Typically, this law leans heavily on economic reasons for its justification as a valid exercise of the police power. But while economics is perhaps inextriccably intertwined with such legislation, in the main the purposes sought to be achieved are aesthetic. Historic preservation promotes aesthetic values by adding to the variety, the beauty and the quality of life. Perhaps it is time that *135 aesthetics took its place as a zoning end independently cognizable under the police power for “ a high civilization must 15 * * give full value and support to the * * * great" branches of man’s scholarly and cultural activity in order to achieve a better understanding of the past, a better "analysis of the present) and a better view of the future ”. (National Foundation on the Arts and Humanities Act of 1965, U. S. Code, tit. 20, § 951.) Indeed, under our cases that would be but a moderate analogical extension. (See Perlmutter v. Greene, 259 N. Y. 327; People v. Stover, 12 N Y 2d 462; Matter of Cromwell v. Ferrier, 19 N Y 2d 263; People v. Goodman, 31 N Y 2d 262.)